TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
LAUREN E. BORDER (Cal. Bar No. 327770)
Assistant United States Attorney
Transnational Organized Crime Section
CLIFFORD D. MPARE (Cal. Bar No. 337818)
Assistant United States Attorney
Major Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-8231/4962
    Facsimile: (213) 894-0141
    E-mail:    lauren.border@usdoj.gov
             clifford.mpare@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:25-cr-00780-SVW |
|           Plaintiff, | GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL, OR FOR A NEW TRIAL |
|           v. | |
| CYNTHIA RAYGOZA, | Hearing Date: May 18, 2026 |
|   aka "Cynthia Curiel Curiel," | Hearing Time: 11:00 a.m. |
| ASHLEIGH BROWN, | Location:    Courtroom of the |
|   aka "ice_out_ofla," |              Hon. Stephen V. |
|   aka "corn_maiden_design," and |              Wilson |
| SANDRA CARMONA SAMANE, | |
|   aka "Sandra Karmona," | |
|   aka "Sandra Carolina Carmona Samame," | |
|   aka "Sandra Carmona Samame," | |
|           Defendants. | |

     Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central

District of California and Assistant United States Attorneys Lauren E. Border and Clifford D. Mpare, hereby files its Omnibus Opposition to defendants CYNTHIA RAYGOZA and ASHLEIGH BROWN's Motions for Judgment of Acquittal or for a New Trial. (Dkt. 188 ("Raygoza Mot."), dkt. 213 ("Brown Mot.").)  The government submits that its omnibus response furthers efficiency and judicial economy, as defendants' legal claims in both motions substantially overlap.

This opposition is based upon the attached memorandum of points and authorities, the exhibits attached hereto, and the files and records in this case, and such further evidence and argument as the Court may permit.  The government's opposition relies upon the following exhibits:[1]

| Exhibit | Description |
|---|---|
| **DEFENSE EXHIBITS** | |
| **Brown Mot. Exhibit A** | 2/24/26 Trial Transcript (Trial Day 1) (Dkt. 213-1) |
| **Brown Mot. Exhibit B** | 2/25/26 Trial Transcript (Trial Day 2) (Dkt. 213-2) |
| **Brown Mot. Exhibit C** | 2/26/26 Trial Transcript (Trial Day 3) (Dkt. 213-3) |
| **Brown Mot. Exhibit E** | Trial Exhibit 5 (manually filed by defense) |
| **Brown Mot. Exhibit F** | Trial Exhibit 6 (manually filed by defense) |
| **Brown Mot. Exhibit G** | Trial Exhibit 8 (manually filed by defense) |
| **Brown Mot. Exhibit M** | Trial Exhibit 28.2 (manually filed by defense) |

---

[1] The government has not re-filed exhibits it relies upon that defendants have already filed to streamline the evidence submitted to the Court.

2

| GOVERNMENT EXHIBITS | |
|---|---|
| **Government Exhibit A** | Trial Exhibit 3 (manually filed by the government) |
| **Government Exhibit B** | Trial Exhibit 16 |
| **Government Exhibit C** | Trial Exhibit 26 (manually filed by the government) |
| **Government Exhibit D** | Trial Exhibit 14 (manually filed by the government) |

Dated: April 16, 2026   Respectfully submitted,

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division


_____/s/_____
LAUREN E. BORDER
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

3

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.   INTRODUCTION....................................................1

II.  STATEMENT OF FACTS..............................................2

III. PROCEDURAL HISTORY.............................................5

IV.  LEGAL STANDARDS................................................6

     A.   Rule 29 Motion for Judgment of Acquittal.................6

     B.   Rule 33 Motion for New Trial.............................8

V.   RULE 29: A REASONABLE JURY COULD, AND DID, FIND THAT
     DEFENDANTS ARE GUILTY OF STALKING R.H..........................8

     A.   Defendants' Crimes Were Not Protected by the First
          Amendment................................................9

     B.   Defendants Engaged in a "Course of Conduct".............13

VI.  RULE 33: THE INTERESTS OF JUSTICE DO NOT DEMAND A NEW TRIAL...16

     A.   The Stalking Jury Instruction Was a Correct Statement
          of Law..................................................16

          1.   Definitions of "Harass," "Intimidate," and
               "Substantial Emotional Distress"...................19

          2.   Definition of "Course of Conduct"..................21

     B.   The Government's Closing Argument Was Legally Sound......22

          1.   Course of Conduct..................................22

          2.   The Right to Protest in Residential Neighborhoods...23

VII. CONCLUSION....................................................24

i

**TABLE OF AUTHORITIES**

Page(s)

Cases

City of San Diego, Cal. v. Roe,
  543 U.S. 77 (2004) ............................................... 12

Frisby v. Schultz,
  487 U.S. 474 (1988) .............................................. 11

Jackson v. Virginia,
  443 U.S. 307 (1979) ............................................... 7

Snyder v. Phelps,
  562 U.S. 443 (2011) .......................................... 12, 13

United States v. Ackell,
  907 F.3d 67 (1st Cir. 2018) .................................. 13, 19

United States v. Alarcon-Simi,
  300 F.3d 1172 (9th Cir. 2002) .................................... 8

United States v. Camacho,
  555 F.3d 695 (8th Cir. 2009) ..................................... 8

United States v. Corona-Verbera,
  509 F.3d 1105 (9th Cir. 2007) .................................... 7

United States v. Del Toro-Barboza,
  673 F.3d 1136 (9th Cir. 2012) .................................... 8

United States v. Dennis,
  132 F.4th 214 (2d Cir. 2025) .................................... 20

United States v. Espino,
  892 F.3d 1048 (9th Cir. 2018) ................................... 16

United States v. Gonzalez,
  905 F.3d 165 (3d Cir. 2018) ..................................... 11

United States v. Gwaltney,
  790 F.2d 1378 (9th Cir. 1986) ................................... 22

Page(s)

**TABLE OF AUTHORITIES (CONTINUED)**

Cases

United States v. H.B.,
  695 F.3d 931 (9th Cir. 2012) ....................................... 8

United States v. Hinton,
  222 F.3d 664 (9th Cir. 2000) ................................... 7, 16

United States v. Kellington,
  217 F.3d 1084 (9th Cir. 2000) ................................. 8, 16

United States v. Lombera-Valdovinas,
  429 F.3d 927 (9th Cir. 2005) ....................................... 7

United States v. Miller,
  953 F.3d 1095 (9th Cir. 2020) ................................ 16, 17

United States v. Nevils,
  598 F.3d 1158 (9th Cir. 2010) ................................... 7, 9

United States v. Osinger,
  753 F.3d 939 (9th Cir. 2014) ................................. passim

United States v. Perez,
  116 F.3d 840 (9th Cir. 1997) ...................................... 17

United States v. Rich,
  580 F.2d 929 (9th Cir. 1978) ...................................... 23

United States v. Rocha,
  598 F.3d 1144 (9th Cir. 2010) ...................................... 6

United States v. Rodrigues,
  159 F.3d 439 (9th Cir. 1998) ...................................... 22

United States v. Rojas,
  554 F.2d 938 (9th Cir. 1977) ....................................... 8

United States v. Rush,
  749 F.2d 1369 (9th Cir. 1984) ...................................... 8

United States v. Shrader,
  675 F.3d 300 (4th Cir. 2012) ...................................... 19

United States v. Sryniawski,
  48 F.4th 583 (8th Cir. 2022) ...................................... 12

**TABLE OF AUTHORITIES (CONTINUED)**

Page(s)

Cases

United States v. Stevens,
   559 U.S. 460 (2010) ............................................... 11

United States v. Terry,
   911 F.2d 272 (9th Cir. 1990) ...................................... 7

United States v. Thongsy,
   577 F.3d 1036 (9th Cir. 2009) .................................... 16

United States v. Young,
   470 U.S. 1 (1985) ................................................ 22

Statutes

18 U.S.C. § 119................................................... 5

18 U.S.C. § 371................................................... 5

18 U.S.C. § 2261A............................................. passim

Rules

Fed. R. Crim. P. 29.......................................... 6, 7, 12

Fed. R. Crim. P. 33................................................ 8

Fed. R. Crim. P. 52(a)........................................... 16

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

On February 27, 2026, defendants CYNTHIA RAYGOZA ("Raygoza") and ASHLEIGH BROWN ("Brown") (collectively, "defendants") were convicted of stalking R.H., an ICE agent.  Twelve Los Angeles jurors unanimously found that, on August 28, 2025, the defendants caused - or could reasonably be expected to cause - substantial emotional distress to R.H. and his immediate family when they followed R.H. several miles from his workplace to his home, screamed at him in front of his wife and young children while wearing masks and all black, and live-streamed their address to hundreds, if not thousands, of social media followers, prompting additional strangers to appear outside R.H.'s home later that day.

In an effort to set aside the jury's unanimous verdict, the defendants have filed motions seeking a judgment of acquittal or, alternatively, a new trial.  These motions simply attempt to relitigate issues the Court has already considered and rejected.  The Court correctly found that defendants' actions were not protected by the First Amendment, and the fact that their harassment took place during a single day does not preclude a finding of a "course of conduct" under the stalking statute.

Defendants' motions should thus be denied.  A rational trier of fact could have found - and, in fact, twelve did find - that defendants are guilty of stalking.  Nor did a serious miscarriage of justice occur warranting a new trial.  The jury's verdict should not be disturbed.

## II.   STATEMENT OF FACTS

On August 28, 2025, the defendants in this case – while dressed in all black and concealing their faces with black masks – followed R.H. in his vehicle from a federal building in downtown Los Angeles to his personal residence miles away in Baldwin Park.[1]  (Brown Mot. Ex. B at 86:20-87:6; 88:1-18.)  The defendants livestreamed on their Instagram accounts their pursuit of R.H. in his government vehicle, and provided directions as they followed the victim home, encouraging their viewers to share the livestream.  (See Brown Mot. Ex. G.)

When R.H. arrived at his personal residence, he exited his government vehicle and got into the front passenger seat of his personal vehicle, where his wife (J.H.) was waiting with their two boys in the backseat, ages three and seven.  (Brown Mot. Ex. B at 87:6-10; 99:15-16.)  R.H. and his family then noticed two masked females, later identified as defendant Raygoza and Sandra Samame, approach R.H. in his personal car while recording with their phones. (Brown Mot. Ex. B at 88:1-18.)  Defendants' black sedan was parked in a neighbor's driveway approximately 100 feet away from R.H.'s home. (Id.)  Standing by the sedan was a third masked female, later identified as Brown, who was also recording on her phone.  (Id.) Just three weeks earlier, Brown had been released on bond in a federal criminal case alleging she assaulted a federal officer during an ICE protest.  (Case No. 2:25-cr-00701-FMO, dkt. 52.)  As a condition of her release, the court ordered her to remain at least 100 feet away from federal law enforcement agents. (Id.)

---

[1] R.H. is an ICE officer who specializes in removing sex offenders from the country.  (Brown Mot. Ex. B at 80:25-81:1.) He was heading home to his family for an outing that included a surprise for his young sons.  (Brown Mot. Ex. B at 87:11-15.)

2

Defendants began to verbally attack R.H. and his family. Defendant Raygoza shouted to bystanders while livestreaming on Instagram that their "neighbor is ICE," "la migra lives here," and "ICE lives on your street and you should know." (Brown Mot. Ex. F.) Raygoza also called R.H. a "piece of shit" and "race traitor," and also threatened to "pop" him, which R.H. understood to mean "shoot" him. (Id.; Brown Mot. Ex. B at 114:11-25.) Raygoza also accosted R.H.'s wife, J.H., and repeatedly called her a "white bitch."[2] (Brown Mot. Ex. B at 223:2-14.) Both J.H. and a concerned neighbor called 911 in response to the defendants' actions. (Brown Mot. Ex. B at 15:14-17.) R.H.'s two young boys who witnessed the incident became distressed in the back of the car and can be heard audibly crying on video. (**Gov't Ex. D** (Trial Ex. 14); Brown Mot. Ex. B at 228:16-20.) The three-year-old, who has autism, became overstimulated and began kicking his legs and covering his ears and face. (Brown Mot. Ex. B at 223:24-224:8.) His seven-year-old brother attempted to console him by asking him to look away from the people surrounding their car, making funny faces, and playing hand games with him. (Brown Mot. Ex. B at 224:8-16.) Nothing worked. (Id.)

Although Raygoza and Brown could have got into Brown's car and drove away, they continued to harass R.H. and his family. (**Gov't Ex. C** (Trial Ex. 26) at 0:00-0:33; Brown Mot. Ex. C at 11:4-12:3.) After hearing distant police sirens, Brown draped a black cloth over her car's license plate. (Gov't Ex. C at 0:00-0:45; Brown Mot. Ex. C at 11:4-12:3.) And even after Baldwin Park Police Officers arrived,

---

[2] J.H. testified at trial that she found this offensive because she is Native American and Mexican. (Brown Mot. Ex. B at 223:2-14.)

3

Brown live-streamed an address approximately 100 feet from the victim's residence on her public Instagram account, "ice_out_ofla." (Brown Mot. Ex. E; **Gov't Ex. A** (Trial Ex. 3) at 0:27-0:36; 1:06-1:12.)  In the video, she zoomed in on R.H. and stated, "there's the ICE agent - this is where he lives, apparently," before urging her followers to "come on down."  (Id.)  Just seconds before releasing the neighborhood address, Brown refused to give her first name to a police officer because she was livestreaming, asserting that to reveal such information online to her followers would be "uncomfortable."  (Gov't Ex. A at 0:39-0:50.)  Brown streamed the address of the neighborhood yet again moments later.  (Brown Mot. Ex. M.)

In response to Brown's livestream, four or five masked individuals gathered outside the victim's home, shouting and recording the scene on their phones. (Brown Mot. Ex. B at 115:16-19; Brown Mot. Ex. C at 41:4-23.)  After the incident, R.H. and his family spontaneously found online footage of them (clearly showing their faces, neighborhood, personal vehicle, and tattoos), where certain Instagram users reposted Brown's live-streamed video with captions such as "this scumbag," and restated the neighborhood address.  (Brown Mot. Ex. B at 116:7-118:23; **Gov't Ex. B** (Trial Ex. 16).)

As a result of defendants' harassment, R.H. and his family have suffered severe emotional distress.  (See, e.g., Brown Mot. Ex. B at 223:2-14.)  R.H. and his family feared for their lives and safety on August 28, 2025.  (Brown Mot. Ex. B. at 100:5-13; 231:6-15.)  They did not know if defendants had weapons, or what harm the others who arrived in response to the livestream would do to their family.

4

(Brown Mot. Ex. B. at 105:16-23; 231:6-15.)  But the impact of defendants' actions did not end on August 28.  Increased car traffic from onlookers in their neighborhood in the ensuing weeks caused R.H. and his family to move to a different county 45 minutes away.  (Brown Mot. Ex. B at 119:16-120:5; 231:16-233:25.)  The forced relocation significantly disrupted the education of the victim's children: R.H.'s daughters now have to commute over an hour to school each way (whereas before they simply walked down the street), and the victim's 15-year-old-son has decided to be homeschooled rather than attend high school.  (Brown Mot. Ex. B at 234:1-235:14.)  As a result of the incident, J.H. is in therapy, has difficulty sleeping, and is scared to leave the house.  (Brown Mot. Ex. B at 232:16-233:25.)  The victim's three-year-old son with autism also lost several social and health care benefits because the family moved to a different county. (Brown Mot. Ex. B at 235:15-236:18.)

## III. PROCEDURAL HISTORY

For their actions, a grand jury indicted defendants on January 15, 2026 in a first superseding indictment[3] for violating 18 U.S.C. § 371: Conspiracy to Publicly Disclose the Personal Information of a Federal Agent (Count One), and 18 U.S.C. §§ 2261A(2)(B), 2261(b)(5): Stalking (Count Two).  (Dkt. 103.)  Defendants Raygoza and Brown

---

[3] In the original indictment filed September 23, 2025 (dkt. 22), defendants were charged with (1) Conspiracy to Publicly Disclose the Personal Information of a Federal Agent and (2) Publicly Disclosing the Personal Information of a Federal Agent.  Defendants failed to state the precise home address of R.H. on social media, and instead said the number of a neighbor's home approximately 100 feet away from R.H.'s.  Because 18 U.S.C. § 119 criminalizes making publicly available "the home address" of covered individuals, the government moved to dismiss the substantive count of the original indictment (Count Two).  The government later filed a superseding indictment (dkt. 103), which added the stalking charge.

filed a motion to dismiss the stalking charge of the indictment on January 24, 2026 and February 2, 2026, respectively, arguing (1) the government could not show the requisite "course of conduct" for the stalking charge, and (2) the stalking charge was unconstitutional under the First Amendment as applied to this case. (See dkts. 114, 127.) The Court denied the motions to dismiss, and the case proceeded to trial on February 24, 2026.

After three days of evidence and one day of deliberation, the jury found defendants not guilty of conspiracy to publicly disclose the personal information of a federal agent (Count One) but convicted defendants Raygoza and Brown of stalking R.H. (Count Two).[4] On March 13, 2026 and March 27, 2026, defendants Raygoza and Brown, respectively, filed motions for a judgment of acquittal, and in the alternative, for a new trial. (Dkts. 188 ("Raygoza Mot."), 213 ("Brown Mot.").) The motions are set to be heard on May 18, 2026. (Dkt. 218.)

**IV. LEGAL STANDARDS**

    **A.    Rule 29 Motion for Judgment of Acquittal**

Under Fed. R. Crim. P. 29 ("Rule 29"), "[t]he hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high." United States v. Rocha, 598 F.3d 1144, 1153 (9th Cir. 2010) (explaining that the test to be applied for a Rule 29 motion is the same as for a sufficiency challenge). "The test is whether the evidence and all reasonable inferences which may be drawn from it, when viewed in the light most favorable to the government, sustain

---

[4] Defendant Samame was acquitted of both counts.

the verdict."  United States v. Terry, 911 F.2d 272, 278 (9th Cir. 1990).

Under Rule 29, a court must "review the evidence presented against the defendant in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  See United States v. Lombera-Valdovinas, 429 F.3d 927, 920 (9th Cir. 2005) (internal quotation marks omitted and emphasis added); United States v. Hinton, 222 F.3d 664, 669 (9th Cir. 2000) ("There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offenses charged beyond a reasonable doubt").  Any "[c]onflicting evidence is to be resolved in favor of the jury verdict[.]"  See United States v. Corona-Verbera, 509 F.3d 1105, 1117 (9th Cir. 2007).  Accordingly, the Court "may not 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'"  United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)).  The question is only whether "all rational fact finders" would have voted to acquit.  Id. at 1165.  As such, the Court considers whether the defendant has "pointed to evidence so supportive of innocence that no rational trier of fact could find guilt beyond a reasonable doubt."  Id. at 1169.  A jury's determination should be upset only on those "rare occasions in which a properly instructed jury may convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt."  Id. at 1164 (cleaned up).

In ruling on a Rule 29 motion, the Court "must bear in mind that

7

it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." United States v. Rojas, 554 F.2d 938, 943 (9th Cir. 1977) (internal quotation marks omitted). "Therefore, in a case involving factual disputes and credibility determinations," the Court "must presume ... that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." United States v. H.B., 695 F.3d 931, 935 (9th Cir. 2012) (internal quotation marks omitted); see also United States v. Alarcon-Simi, 300 F.3d 1172, 1176 (9th Cir. 2002) ("[I]t is not the district court's function to determine witness credibility when ruling on a Rule 29 motion.").

**B.   Rule 33 Motion for New Trial**

The standard for granting a motion pursuant to Fed. R. Crim. P. 33 ("Rule 33") is similarly stringent. A new trial under Rule 33 should only be granted where the "evidence preponderates sufficiently heavily against the verdict" such that "a serious miscarriage of justice may have occurred." United States v. Kellington, 217 F.3d 1084, 1097 (9th Cir. 2000). Courts should grant Rule 33 motions only "in exceptional circumstances in which the evidence weighs heavily against the verdict." United States v. Del Toro-Barboza, 673 F.3d 1136, 1153 (9th Cir. 2012); accord United States v. Rush, 749 F.2d 1369, 1371 (9th Cir. 1984); United States v. Camacho, 555 F.3d 695, 705 (8th Cir. 2009) ("New trial motions based on the weight of the evidence are generally disfavored[.]").

**V.   RULE 29: A REASONABLE JURY COULD, AND DID, FIND THAT DEFENDANTS ARE GUILTY OF STALKING R.H.**

When viewing all evidence in the light most favorable to the

government, any rational juror could conclude, and in fact 12 jurors did conclude, that defendants stalked R.H.  Defendants' motions rehash previous arguments that (1) imposing criminal liability for stalking in this case violates the First Amendment, and (2) defendants' conduct does not constitute a "course of conduct" under the stalking statute.  These arguments are meritless, as the Court already determined before trial.  While defendants may dispute the weight and credibility of the evidence presented at trial (which naturally occurs in <u>every</u> trial), the resolution of such disputes is the exclusive function of the jury, and the jury resolved those disputes in favor of the government.  Defendants have not "pointed to evidence so supportive of innocence that no rational trier of fact could find guilt beyond a reasonable doubt."  <u>Nevils</u>, 598 F.3d at 1169.  Accordingly, defendants' motions should be denied.

**A.  Defendants' Crimes Were Not Protected by the First Amendment**

Defendant Brown argues the government failed to prove at trial that she engaged in any speech or conduct unprotected by the First Amendment.  (Brown Mot. 4-12.)  But even if stalking involves some spoken or written communication, that does not transform a crime into constitutionally protected expression, as the Ninth Circuit has made clear.  In <u>United States v. Osinger</u>, 753 F.3d 939 (9th Cir. 2014), the Circuit held that the stalking statute, 18 U.S.C. § 2261A, was facially constitutional under the First Amendment because it regulates <u>conduct</u> rather than speech.  <u>Osinger</u>, 753 F.3d at 944 ("[t]he proscribed acts are tethered to the underlying criminal conduct and not to speech").  In that case, the Ninth Circuit noted the defendant's course of conduct consisted of "showing up at [the

victim]'s home," creating "a false Facebook page," and sending texts and emails.  Id. at 952-53 (Watford, J., concurring).  In his concurrence, Judge Watford emphasized that it was a particularly "straightforward case [because] Osinger committed the offense by engaging in both speech and unprotected non-speech conduct."  Id.; see also id. ("Here, the non-speech conduct consisted of in-person harassment, which, together with the text messages, emails, and Facebook page, violated § 2261A(2).") (emphasis added).

The same analysis controls here.  The government proved at trial that defendants Raygoza and Brown, aiding and abetting each other,[5] harassed R.H. in-person.  They followed R.H. home from work while wearing masks and all black.  Both defendants screamed at R.H.'s neighbors that R.H. works for ICE, causing one neighbor to call 911.  Defendant Raygoza approached and accosted R.H. and his family, including by threatening physical violence.  Raygoza and Brown each live-streamed to hundreds, if not thousands, of strangers R.H.'s neighborhood block, the license plate of R.H.'s personal car, and R.H.'s and J.H.'s identifying features, including tattoos.  Defendant Brown covered up the license plate of her car with a black cloth in response to police sirens, and then live-streamed their location in Baldwin Park not once, but twice, to incite others to arrive on scene and continue intimidating R.H. (which was successful).  Thus, as in

---

[5] Brown argues that "it is important to recognize that her interactions with [R.H. and J.H.] were limited in comparison to the other defendants."  (Brown Mot. 7.)  But as the jury was properly instructed, "a defendant may be found guilty . . . even if the defendant personally did not commit the act or acts constituting the crime but aided and abetted in its commission."  (Ninth Circuit Manual of Model Criminal Jury Instructions, No. 4.1 (Aiding and Abetting).)  And in any event, Brown's actions alone support her guilty verdict.  Indeed, she was the one to (among other things) twice live-stream R.H.'s neighborhood address.

Osinger, "[a]ny expressive aspects of [defendants'] speech were not protected under the First Amendment because they were 'integral to criminal conduct' in intentionally harassing, intimidating or causing substantial emotional distress" to R.H. and his family.  Osinger, 753 F.3d at 947 (cleaned up); see also United States v. Stevens, 559 U.S. 460, 468 (2010) (acknowledging speech integral to criminal conduct is not subject to First Amendment protection); United States v. Gonzalez, 905 F.3d 165, 193 (3d Cir. 2018) (rejecting First Amendment as-applied challenge, noting "[t]he defendants' speech served no legitimate purpose other than to harass and intimidate [the victim], conduct that is illegal under § 2261A").

Defendant Brown notes that the First Amendment "strongly protects filming and speech on matters of public concern, including in residential neighborhoods."  (Brown Mot. 4.)  The government agrees.  This does not change the result.  As the jury unanimously determined, on August 28, 2025, defendants crossed the line from any form of peaceful political protest to criminal harassment and stalking of a single ICE agent at his home.  "[I]ndividuals are not required to welcome unwanted speech into their own homes," and "[t]he First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech."  Frisby v. Schultz, 487 U.S. 474, 487 (1988) (noting "[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society") (cleaned up).  Defendants were not engaged in politically protected speech about a matter of public concern.  Defendants were not live-streaming an ICE officer performing his duties.  They followed R.H., dressed in plain clothes,

11

to his personal residence, where he planned to run an errand with his wife and children.  Far from a matter of public concern, defendants instead recorded the mundane intimacies of R.H.'s life.  Compare City of San Diego, Cal. v. Roe, 543 U.S. 77, 84 (2004) (videos of police officer engaging in private acts did not address a "public concern" since the videos "did nothing to inform the public about any aspect of the [employing agency's] functioning or operation") with Snyder v. Phelps, 562 U.S. 443, 449 (2011) ("the political and moral conduct of the United States and its citizens, the fate of the Nation, homosexuality in the military, and scandals involving the Catholic clergy" are considered matters of public concern, particularly where the protestors "did not yell or use profanity").

Defendant Brown relies upon United States v. Sryniawski, 48 F.4th 583 (8th Cir. 2022) to argue the evidence at trial was insufficient to support her stalking conviction.  (Brown Mot. 6, 9.) But Sryniawski is easily distinguishable.  In reversing the denial of a Rule 29 motion, the Eighth Circuit narrowly held that "the cyberstalking statute cannot be applied constitutionally to a defendant who directs speech on a matter of public concern to a political candidate with intent merely to trouble or annoy the candidate" – a far cry from the facts at hand.  Sryniawski, 48 F.4th at 587.  Glaringly, Sryniawski acknowledged that speech integral to criminal conduct is not protected by the First Amendment, such as when there is accompanying "in-person harassment," as there is here, and explicitly cited Osinger.  Id. at 588.  Despite Brown's best efforts to distance herself from the binding Ninth Circuit opinion, Osinger continues to control in light of defendants' in-person conduct.

12

Finally, Brown cites Snyder v. Phelps, 562 U.S. 443 (2011) for the proposition that a judgment of acquittal under Rule 29 is required. (Brown Mot. 10-12.) Not so. Snyder was a civil case concerning pure speech and tort liability, and did not concern Rule 29 or the stalking statute, which criminalizes conduct. As noted above, defendants' speech did not touch upon a matter of concern as the speech did in Snyder, and in any event, Osinger's analysis applies because defendants' crime involved both speech and conduct. Brown also misses the point by arguing the charge in this case "suffers from [a] content-discrimination problem" identified in Snyder because "[t]here is no question that Ms. Brown would not have been charged with cyberstalking if she had delivered *pro*-ICE messages." (Brown Mot. 11, emphasis in original.) The stalking statute, 18 U.S.C. § 2261A, outlaws intentionally harassing or intimidating conduct. As the First Circuit has held, because the statute focuses on conduct, "it cannot be so that § 2261A(2)(B) is an impermissible content- or viewpoint-based restriction on speech." United States v. Ackell, 907 F.3d 67, 78 (1st Cir. 2018).

In sum, defendants cannot escape the Ninth Circuit's holding in Osinger, and the First Amendment does not support overturning the jury's conviction on a motion for acquittal.

**B.    Defendants Engaged in a "Course of Conduct"**

The government also proved beyond a reasonable doubt to twelve jurors that defendants' actions on August 28, 2025 constituted a "course of conduct" under the stalking statute. As all parties agree, "course of conduct" is statutorily defined as "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266(2).

13

At trial, the government proved that defendants, aiding and abetting each other, dressed in all black and followed R.H. from his work to his personal residence, live-streamed their pursuit, harassed R.H. outside his residence in-person in front of his wife and small children, live-streamed R.H. and J.H.'s faces and the license plate of their personal vehicle, live-streamed the block R.H. lives on, yelled at R.H.'s neighbors and prompted one to call 911, released the neighborhood's address to strangers on the internet twice, and even threatened to "pop" R.H.  At minimum, the government proved each of the eleven acts listed in Count Two of the superseding indictment that constitute defendants' course of conduct. (Dkt. 103.)  The jury thus reasonably found that defendants had engaged in a "course of conduct" under the stalking statute, and flatly rejected defendant Raygoza's assertion that "[t]he government's evidence showed a single, continuous event on August 28, 2025." (Raygoza Mot. 10.)

Defendants now attempt to downplay their actions.  Defendant Brown, for example, argues she tried to "create distance" between herself and R.H. and "stepped back from the situation" when R.H. approached (Brown Mot. 8-9, 13), while ignoring the fact that she was under an active court order to remain at least 100 feet away from law enforcement officers as a term of her bond in a federal criminal case alleging she assaulted a federal officer.  Additionally, Raygoza notes "the conduct of the defendants was limited to [a] single day," and Brown similarly asserts her actions cannot be considered a "course of conduct" because they did not "persist[] over an appreciable period of time."  (Raygoza Mot. 13; Brown Mot. 13.)

14

Neither the statute nor case law imposes any specific timeline for conduct to constitute stalking.[6]  Both defendants point to stalking cases where a defendant's conduct occurred over days or more.  (See Raygoza Mot. Ex. A.)  They assert the government cannot identify any case law in which the stalking statute was applied on facts similar to those proven at trial, where the harassment of the victim lasted less than one day. (See, e.g., Brown Mot. 13.)  But this case is factually unique, as every case is; the more appropriate question is thus whether defendants can cite a single case that supports imposing a minimum duration requirement to a stalker's "course of conduct."  Defendants do not and cannot, although the Ninth Circuit has had ample opportunity to impose a minimum duration requirement or another workable test outlining the bounds of "course of conduct" each time it has interpreted the stalking statute.  Yet the Circuit has declined to do so, and for good reason.  The "test" is already in the statutory definition of "course of conduct": two or more acts that evidence a continuity of purpose.  The focus is on the number of acts, a factual question to be determined by the jury.  The passage of time has nothing to do with it, unless, of course, so much time passed between acts that there was no "continuity of purpose" – which is certainly not the case here.

As noted in the government's opposition to defendants' motion to dismiss the stalking count of the indictment (dkt. 136), defendants'

---

[6] Defendant Raygoza also spends several pages discussing the Congressional intent of the stalking statute.  (Raygoza Mot. 12-13.) In essence, Raygoza disputes that she and Brown acted as "tormentors" who threatened and/or harassed R.H. and his family.  This, again, was a factual issue for the jury at trial, and the jury disagreed. Similarly, the non-legal, third-party stalking studies that Raygoza cites (Raygoza Mot. 14-15) are inapposite and miss the mark.

read of the statute would also lead to line-drawing problems and arbitrary results.  For example, would a defendant who commits 40 acts over 23 hours still fall short of violating the statute?

Wisely, the law has chosen not to reward the most efficient stalkers.  The government has cleared the low bar of presenting evidence regarding defendants' course of conduct such that "any rational trier of fact" could find defendants guilty of stalking. Hinton, 222 F.3d at 669.

**VI.  RULE 33: THE INTERESTS OF JUSTICE DO NOT DEMAND A NEW TRIAL**

Both the Court's jury instructions and the government's closing arguments were faithful to the law.  Defendants thus fail to show "a serious miscarriage of justice may have occurred" and the Court should deny their request for a new trial.  Kellington, 217 F.3d at 1097 (9th Cir. 2000).

**A.    The Stalking Jury Instruction Was a Correct Statement of Law**

While a motion for a new trial under Rule 33 may be granted for failure to give proper jury instructions, an instructional error does not automatically warrant a new trial: the defendant must show that the error affects "substantial rights." See Fed. R. Crim. P. 52(a); United States v. Miller, 953 F.3d 1095, 1103 (9th Cir. 2020). "[A]n error in misdescribing or omitting an element of the offense in a jury instruction is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error."  United States v. Thongsy, 577 F.3d 1036, 1043 (9th Cir. 2009) (citation omitted).  The Ninth Circuit has made clear that when applying this standard, a court should consider "the jury instructions and the trial record as a whole."  United States v.

16

Espino, 892 F.3d 1048, 1053 (9th Cir. 2018).  Where the evidence actually presented at trial and "other language in the jury instructions" assures the court that the jury could not have based its verdict on the erroneous language in the instruction, the Ninth Circuit has found the error to be harmless.  Miller, 953 F.3d at 1103; see also United States v. Perez, 116 F.3d 840, 847 (9th Cir. 1997) ("Even though an element of the offense is not specifically mentioned [in the jury instructions], it remains possible the jury made the necessary finding.").

At trial, the instructions informed the jury the government must prove the following elements beyond a reasonable doubt for a defendant to be guilty of stalking:

"First, that the defendant possessed the intent to harass or intimidate R.H., or place him under surveillance with the intent to harass or intimidate him;

Second, that the defendant pursued that intention through a course of conduct that made use of an interactive computer service, an electronic communication system of interstate commerce, interstate wires, the internet, or any other facility of interstate or foreign commerce; and

Third, that the defendant's course of conduct caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to R.H., R.H.'s spouse, or a member of R.H.'s immediate family."

(Dkt. 209 at 16.)

The instructions also used the following definitions:

- "'Harass' means to repeatedly or persistently use words, conduct, or action that, being directed at a specific

person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose."

- "'Intimidate' in this context means to make timid or fill with fear."

- "'Substantial emotional distress' means mental distress, mental suffering, or mental anguish, and includes depression, dejection, shame, humiliation, mortification, shock, indignity, embarrassment, grief, anxiety, worry, fright, disappointment, nausea, and nervousness, as well as physical pain."

- "A 'course of conduct' is a pattern of conduct composed of two or more acts, evidencing a continuity of purpose. You may consider each communication between the defendant and R.H. or his family members as a separate act. You are not required to agree unanimously on which two or more acts constitute the course of conduct. Not all acts that constitute part of a course of conduct must involve the use of an interactive computer service, an electronic communication system of interstate commerce, interstate wires, the internet, or any other facility of interstate or foreign commerce."

(Dkt. 209 at 16-17.)

Defendants Raygoza and Brown raise several issues with respect to the stalking jury instruction, each of which derives from the same meritless arguments made in support of their motion for acquittal. As explained below, defendants are not entitled to a new trial because the stalking jury instruction correctly stated the law.

18

           1.    Definitions of "Harass," "Intimidate," and "Substantial Emotional Distress"

Defendant Brown attacks the Court's definitions of "harass," "intimidate," and "substantial emotional distress" and asserts that they "allowed the jury to convict [her] of conduct protected by the First Amendment." (Brown Mot. 17.) To the contrary, the definitions set forth in the jury instructions are consistent with binding Ninth Circuit law and have been used in trials across the country.

First, regarding the definition of "harass," the Ninth Circuit in Osinger set forth the same definition as the jury instruction here. See Osinger, 753 F.3d at 945 (analyzing the stalking statute and defining the common understanding of "harass" as "words, conduct, or action . . . that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose"). Second, the Court's definition of "substantial emotional distress" was also taken directly from Osinger. Id. at 945; see also United States v. Davis, 5:14-CR-00240-D (E.D.N.C.) (same definition in 18 U.S.C. § 2261A case), Dkt. 808 at 18; United States v. Ackell, 1:15-CR-123-JL (D.N.H.) Dkt. 72 at 26 (same definition in 18 U.S.C. § 2261A case). Defendant Brown's objection that the definition fails to distinguish between "ordinary emotional distress" and "substantial emotional distress" (Brown Mot. 23-24) overlooks that the term "substantial" is expressly part of the definition, and thus built into the legal standard. And third, the Fourth Circuit has held the "common sense" definition of "intimidate" in the context of the stalking statute is "to make timid; fill with fear," as is set forth in the jury instructions. United States v. Shrader, 675 F.3d 300, 310 (4th Cir. 2012); see also Davis, 5:14-CR-

00240-D (E.D.N.C.), Dkt. 808 at 17 (also defining "intimidate" as "to make timid or fill with fear" in 18 U.S.C. § 2261A case).

The Ninth Circuit has rejected defendant Brown's argument that to be consistent with the First Amendment, "harass" and "intimidate" must be defined to only include "true threats."  Again, the definitions set forth in Osinger control.  As explained above, the Circuit found that speech that does not amount to a true threat but is "integral to criminal conduct" may nonetheless constitute stalking.  Osinger, 753 F.3d at 946, 952-53 (e.g., "[A]m about to pull the rug from rite under ur sexxy lil feet!!!").  Defendant Brown attempts to distance herself from Osinger by citing out-of-district cases for the proposition that "intimidate" and "harass" should be defined more narrowly (Brown Mot. 19-20), but these cases do not consider speech that is not subject to a true-threats standard because it is integral to criminal conduct.  See, e.g., United States v. Dennis, 132 F.4th 214 (2d Cir. 2025) (noting "the government never contended that [defendant's] electronic communications were . . . integral to criminal conduct").

In short, the jury did not convict Brown based solely on her speech.  The government presented substantial evidence at trial that Brown harassed R.H. and his family in-person on August 28, 2025 and live-streamed his neighborhood address twice.[7]  Any of Brown's speech was thus integral to her in-person criminal conduct and the propounded jury instructions did not run afoul of the First Amendment.

---

[7] Brown's argument that her speech was not integral to criminal conduct since the jury acquitted her of conspiracy to doxx R.H. (Brown Mot. 22) makes no sense.  This would mean that no defendant could be convicted on a one-count stalking indictment.

20

## 2.    Definition of "Course of Conduct"

Defendants also take issue with the Court's instruction to the jury that when evaluating defendants' course of conduct, "[y]ou may consider each communication between the defendant and R.H. or his family members as a separate act."  Again, courts across the country have used this exact definition to define course of conduct in stalking cases.  See United States v. Pantchev, 2:21-CR-00050-JFW (C.D. Cal.), Dkt. 218 at 20 ("You may consider each communication between the defendant and the victims as a separate act."); Davis, 5:14-CR-00240-D (E.D.N.C.), Dkt. 808 at 18 ("You may consider each communication between the defendant and [the victim] to be a separate act."); Ackell, 1:15-CR-123-JL (D.N.H.), Dkt. 72 at 42 (""You may consider each communication between David Ackell and [the victim] to be a separate act.").

Defendant Brown complains that this commonly used instruction was "extraordinarily misleading in the context of this case, where the only communications between the defendants and [R.H.] and his family occurred during a face-to-face conversation . . . ."   (Brown Mot. 22.)  Defendant Raygoza similarly emphasizes that defendants in other stalking cases sent "emails," "text messages," and "other electronic communications."  (Ragoza Mot. 22-24.)  Defendants offer no reason why in-person communications should be treated any differently than, for example, letters or electronic communications. Indeed, face-to-face harassment is generally more likely to cause emotional distress to a victim than harassment communicated through the mail or a cellphone, particularly when there is an active threat of violence.   See Brown Mot. Ex. F (Raygoza threatening to "pop"

21

R.H.). The Court's instruction defining course of conduct was therefore proper and does not provide a basis for a new trial.

**B. The Government's Closing Argument Was Legally Sound**

The government's closing argument is also not grounds to grant defendants a new trial. Counsel are permitted "a degree of latitude" when making closing arguments. With respect to prosecutors, the Court must allow the government to strike "hard blows" based on the evidence presented and all reasonable inferences. United States v. Gwaltney, 790 F.2d 1378, 1385 (9th Cir. 1986). Moreover, "inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." Id. (citing United States v. Young, 470 U.S. 1 (1985).) Instead, overturning a conviction is only warranted where the statement "undermines the fundamental fairness of the trial and contributes to a miscarriage of justice." Id.

1. Course of Conduct

Defendant Brown argues that during closing argument, "the government repeatedly misstated the course-of-conduct element by claiming that it required nothing more than two acts, with each communication constituting a separate act." (Brown Mot. 24.) As explained above, the Court's instruction to the jury – and the government's repetition of it during closing argument – was legally sound. While defendant also complains that the government "erased the additional statutory requirements that the two acts constitute a 'pattern' and that they 'evidenc[e] a continuity of purpose" (Brown Mot. 24), a jury is "regularly presumed to accept the law as stated by the court, not as stated by counsel." United States v. Rodrigues, 159 F.3d 439, 451 (9th Cir. 1998). And in any event, defendants'

22

continuity of purpose was glaringly apparent to the jury from the government's argument: to harass and intimidate R.H. and his family. See, e.g., Brown Mot. Ex. C at 117:12-14 ("MR. MPARE: There was no reason for defendants to linger at this point other than to intimidate, harass, distress, and cause agitation to [R.H.'s] family."). The government's statement of the law about defendants' course of conduct was proper and not a basis to grant a new trial. See United States v. Rich, 580 F.2d 929, 936 (9th Cir. 1978) ("counsels' arguments to the jury do not require a new trial unless they are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge").

                2.    The Right to Protest in Residential Neighborhoods

Finally, grasping at straws, defendant Brown claims that during closing argument, the "government incorrectly stated the law about the First Amendment right to protest on public residential streets" because it "told the jury that the sidewalk [in R.H.'s neighborhood] was not a 'public forum'" in which Brown could protest. (Brown Mot. 25-26.) The government did no such thing. None of the government's statements that Brown points to suggest to the jury, even implicitly, that the First Amendment fails to protect speech in residential neighborhoods. The government, however, was required to prove beyond a reasonable doubt defendants' mens rea, i.e., their intent to harass and intimidate R.H. The government was thus entitled to argue that defendants' actions – following one ICE agent to his home and yelling at him and his family while live-streaming his neighborhood – was more consistent with an intent to harass than an intent to engage in peaceful protest. Defendants' mens rea was a question of fact for the jury, which unanimously agreed with the government that

defendants had crossed the line from lawful protest to criminal conduct.  Accordingly, the jury's verdict must stand.

**VII. CONCLUSION**

For the foregoing reasons, the government respectfully requests the Court uphold the jury's verdict and deny defendant Raygoza and Brown's Motions for Judgment of Acquittal or for a New Trial (dkts. 188, 213.).

24